Oral argument not to exceed 15 minutes per side, Harold Cronkite for the defendant. May it please the court, your honors, Mr. Sparks, good morning. I've asked to reserve three minutes for my rebuttal, please. I have two principal arguments to address before the court this morning. First, my client, Lee Tevis, did not receive a fair trial. Secondly, each of the convictions against Mr. Tevis, counts 2 through 11, is a legal impossibility and they should be overturned. With respect to my first argument, every criminal defendant has a right to a fair trial. And a fair trial includes the trial judge admitting into evidence relevant pieces of evidence first. Second, that the defendant's counsel be permitted to fully cross-examine and confront any adverse witness pursuant to the Confrontation Clause of the Sixth Amendment. And on that point, I mean, so you're going to the cross of the former bank official and were you trial counsel? That's one place. I was just asking, were you the trial counsel? Yes, your honor. Okay, so you were not able to cross that witness based upon an insurance provision under which the bank would collect, recover all its losses if your client's convicted. The question I have for you there is, why is that such powerful impeachment material when the official doesn't work at the bank anymore? Well, it's particularly relevant because of the timing of the discussion. Why would the official care so much about whether the bank gets its money when the person doesn't work there anymore? Well, I can see a few reasons, your honor. First of all, this is the only gentleman, Mr. Davis, that the United States put on as, for lack of a better term, its bank guy. You're right, he wasn't working. Just bear in mind, I'm focused on why would he care. So you can say whatever you want, but that's what I'm focused on. Yes, your honor. Well, first and foremost, Mr. Tate's misdeeds happened under the nose of Mr. Davis while he worked at the bank. And I'm certainly not going to tell the jury in that instance what to think, but an inference that they could draw is he had some egg on his face from what had happened. And knowing the results of the civil settlement that no money was apparently recovered, when you couple that with the bank insurer agreement, this might be a way for the bank to recoup its losses that happened under the watch of Mr. Davis. Furthermore, when I broached the topic of the bank insurer agreement, there were several bench conferences, and I was told very clearly, here's as far as I'm going to let you go. You may ask Mr. Davis, would the bank benefit if Mr. Tevis is convicted? And you must live with his answer, and you can't ask any other questions. Now, let me ask you a question about that, because that's what I'm focused on here. I'm looking at this colloquy and putting myself in the shoes of the district judge there, and yourself, because I think you raised the issues you're supposed to. You had the bench conferences, as you're supposed to. I'm assuming most district judges would let you have a sidebar on this, and that's essentially what you had? Yes, sir. Okay. So then here's the issue. So the judge, you say, the judge says, I'm not going to let you get into specific questioning of the insurance policy, which I can understand, because the judge, this is not a trial about the insurance policy or whether the claim was handled right, or even whether Mr. Davis behaved properly. It's really, this is an issue about his credibility, right? Yes, Your Honor. Okay. And so then you say, even if he says, no, it wouldn't benefit the bank, leave it alone at that point. And then the judge says, then leave it alone. The answer you get isn't quite that. The answer is more ambiguous than that, not that I'm aware of. Now, at that Could you have gone back to the trial judge and said, all right, judge, can I have a sidebar? And then say, judge, that wasn't the answer. We weren't anticipating that answer. Can I ask another follow-up? I would say the answer, Your Honor, is no. Okay. And why? Because that was the second time that I had asked a question along that line of questioning. I think you'll see either one or two pages prior in the transcript. I asked Mr. Davis, are you familiar with insurance policies and how they relate to the bank? And he said yes. And I said, is the bank in a position to recoup any more funds as a result of these loans? And he said no. So my point, and also Did you have any way to impeach that? I mean, at that point, was the insurance over? Well, the agreement. I mean, it's exactly against what he said. For whatever reason, he didn't give me an accurate answer. And my point, Your Honor, is that would have been the appropriate opportunity under the Sixth Amendment for me to say, wait a minute, that's not what the agreement says. He was presented as the man knowledgeable about the bank's policies, knowledgeable about what is and what is not standard banking practice. For that matter, he's practically there for the United States, accusing my client of fraud. And it was important that I be able to impeach him and expose any bias or motive that may exist for Mr. Davis to testify the way that he did. But I mean, you're making a constitutional claim with respect to your inability to cross him based on this insurance provision. I am, Your Honor. That's right. I mean, it's a pretty high standard here. Sure. I mean, the Sixth Amendment is not micromanaging every evidentiary decision. And I mean, do you really think that this rises to the level of the things that we see in the Supreme Court cases like Van Arsdal and Ogden and so on? Absolutely, Your Honor. And I was even Really? I mean, but again, he's not even working at the bank. I mean, maybe he's embarrassed about it, but is he going to—well, I don't want to repeat myself. I understand. I'm certainly trying my best to— No, you're doing fine. Certainly the district court has a great deal of discretion in limiting the extent and scope of cross-examination. I mean, that's just accepted practice. So I mean, that in and of itself, certainly there's nothing unfair about that inherently, is there? As long as the discretion is exercised appropriately. I mean, I would again point to the language and— Well, you know, here's where you are if you're the district judge at that point. Are you going to permit some side—you know, we don't even know for sure that this witness is aware of the bank's insurance policy. And so we're going to have a little excursion of running down a rabbit trail about an insurance policy that has only the most marginal ability to be of benefit to the defendant at this point, since Mr. Davis is no longer employed there? I mean, is that how the district judge should exercise his discretion in this situation? Well, respectfully, Your Honor, I don't see it as running down a rabbit hole. It's been six years since— Well, I said a rabbit trail. I'm sorry, rabbit trail. It's been six—it's been six—my apologies. It's been six years or so since the alleged conduct in the case. I'm sure the jury is sitting there wondering, why now? Why Mr. Tevis? I'm just trying to give them all the information. And one thing that I noted in his testimony, the court seems very focused on the fact that he didn't work there anymore. On page 1735, page ID 1735 on page 16 of 282 on the second day of trial, Mr. Davis said, and I quote, here at American Founders Bank, we set up an unsecured lending authority. That's just an example of, even though he's not working there at the time, he's speaking as if he is the bank. And that's the representation being made to the jury. So I should have a right to challenge his credibility. What's the other indication you have that your client didn't get a fair trial? The failure of the court—well, I'll run through them as briefly as I can. The second  Is there anything other than what you contend are incorrect evidentiary rulings? Well, the civil settlement agreement, the bank insurer agreement, Sixth Amendment challenges, the jury instructions. I raised an issue with the jury instructions. The jury, as I'm sure the court's read, the jury came back with a question after deliberating for several hours and essentially indicated, look, we don't understand. What are the prerequisites to convict on the three aggravated identity theft counts, 9, 10, and 11? And the United States proposed language, and I'm paraphrasing, but it was convictions on counts 1 through 8 will support convictions for counts 9, 10, and 11. And that's not accurate, first of all. I submit it's coercive and misleading because what I—initially, I said, Your Honor, I'm not comfortable with this will support language. And on the record, as I block quoted, Judge Van Tatenhove said, You know what? I'm not either. I think we need some different language there. What language do you suggest? And I said, Since their question seems to be from the standpoint of what are the prerequisites for 9, 10, and 11, let's tell them specifically to convict on count 9, you must first find that Mr. Tevis is guilty of 1, 3, or 7, and do a tree that way. Well, I mean, a more precise instruction might have said the felony that constitutes a predicate act for counts 9, 10, and 11 may be found in counts whatever. And, you know, so provided you find a conviction of whatever counts it is, then if you also find that the conviction is a shorthand way—I mean, there's nothing inaccurate about it. It's just not as artful or specific as it might have been. Well, I think it's saying it would—will support convictions for 9, 10, and 11. And who knows that juries don't understand what was said better than language like I use, predicate act, and so on and so forth. Well, that's why I alluded to the Webster's Dictionary for will support, because we should assume that it's a layperson definition because none was given for that. But it said 9, 10, and 11. I would point the court to the Blanchard Standard. I believe I met that. And we have the Nunez case that I cited that said jury instructions have to be with concrete accuracy. And then finally—or, I'm sorry, Nunez is they can't be confusing, misleading, or prejudicial. It's the Brown case that says concrete accuracy. Is the confusion that you think would be created by the instruction that this reference to standing alone would lead the jury to think that if, for example, they convict on count 2, that without any further findings, automatically they convict on 9, 10, 11? It certainly felt that way. I think— Well, but he says provided the elements of 9, 10, and 11 are established beyond a reasonable doubt. So that's not what the instruction says. Well, maybe I misunderstood. Well, I mean, the instruction says a guilty verdict for count 2, bank fraud, standing alone will support a conviction for counts 9, 10, and 11. But then the next sentence, as Judge Gibbons points out, says, again, if each and every one of the elements for count 9, 10, and 11 are found beyond a reasonable doubt. So, I mean, what is it—what false conclusion are you worried that the jury might have found from this instruction? I think the term will support suggests that you convict him of everything if you find him guilty of something in 2 through 8. And initially— So what I said initially, if you're concerned that if they convicted on count 2, then they would have gone on to convict on 9, 10, 11 without worrying about whether the separate elements for those counts were met. Is that the concern? That's one possible interpretation. Yes, Your Honor. But what about—I mean, it says exactly the opposite, that you have to go on and find the elements. Well, I would ask why the judge wasn't comfortable with the will support language either, as he said, and then said, let's use different language, which we didn't. I see my lights coming on. May I briefly address my second argument, or should I sit down? I think you should sit down. Yes, ma'am. Thank you. May it please the Court, Andrew Sparks on behalf of the United States. Litev stole over $1 million from American Founders Bank. He received a fair trial and was properly convicted. This Court should affirm that conviction. Starting with the first assertion of error, the Court's decision not to allow evidence of the settlement to come in. The Court was correct in that ruling. Evidence of the civil settlement between five private parties and the bank were in no way relevant to the criminal action that the United States of America was prosecuting. The settlements did not involve the United States. There were no criminal charges addressed in them. They involved private litigants. More importantly, it wasn't for the purpose that is being suggested by counsel. Mr. Tavis is suggesting that the whole purpose of this was to show that the bank thought that these nominee loans to Amigos LLC was paid for. That's clearly not true by the face of the settlement agreement. The payment on the settlement agreement was to a separate entity called A Mile and a Quarter. A Mile and a Quarter was a tech startup and it was a lender liability issue. Had the Court let this in, we would have had to have basically tried every single one of these different allegations and shown what the issues were. It had nothing to do with whether or not Lee Tavis committed bank fraud by using a shell company and a five-year-old social security number to get over a million dollars in bank funds. Moving towards the issue of the insurance agreement, again, that's not relevant either. The same analysis applies. The fact that the bank had an insurance agreement doesn't matter as to whether or not Lee Tavis committed bank fraud. It wasn't relevant. The insurance policy by its own terms doesn't require a conviction. If you look at it, the language they're citing does not require there to be any sort of conviction of anybody in order for the bank to receive funds. It's contradictory to the previous argument that the settlement agreement was some sort of an admission that Mr. Tavis didn't do anything wrong. And then on the other hand, they're arguing that this insurance agreement requires him to prove that he did do something wrong. They seem to be somewhat mutually exclusive. The counsel was allowed to cross-examine the witness. He did. He asked them the question. And while this isn't in the record, again, the fundamental premise is false. The insurance company paid. They paid well before the indictment. There was nothing. So Mr. Tavis's answer was correct. He was asked, does American Founders Bank have any financial interest in the convention? He says, no, not that I'm aware of. That's true. There was nothing to impeach him on. Turning to the issue of bias, I think the court has sort of hit the nail on the head. He didn't work there anymore. He worked at a different bank. He didn't work there anymore. He was cross-examined. He answered truthfully. The bank didn't have any financial incentive for this. Where in the record would you find the information that the insurance company had already paid? I mean, did you make a record of that in some way? Or was that just for our information and argument? That was not in the record, Your Honor. It was never put in by any avowal. We never put any of this. I mean, we've got to stick to the record, you know, in our decision. And we shouldn't even know things that aren't in the record. Regardless of that issue, if you look at the actual terms of the settlement agreement, there's no requirement whatsoever that there be a conviction. But it sure would help if there was a conviction and you were going to argue with your argument between the policyholder and the carrier. If there was a conviction, it would be pretty good evidence that you've got coverage, right? Again, I think you'd have to really litigate the issue of whether or not, I mean, yes, perhaps, it could. The answer is yes, it could. But then I think you have to really get into the terms of this agreement and what exactly is required. And that's why the judge didn't want to go there, because that wasn't the trial. Yes, sir, that was not the trial. That was not the trial at all. Of course, the issue was bank fraud, whether or not there was any bank fraud, 1344, 656, 1014, and then the aggravated identity theft. Again, there was just no indication that Mr. Davis was biased. They asked him about the policy. He answered the question. He wasn't a signatory to that. He wasn't a signatory to the civil agreement. So there was really no basis to go into this. Turning to the issue of the jury instruction, there was nothing confusing, misleading, or prejudicial at all about this jury instruction. I think the focus is on this language of will support. And again, I don't think the United States received any advantage by using the language will support. The issue here, again, was whether or not it was aggravated identity theft that Mr. Davis utilized a five-year-old's Social Security number in getting over a million dollars' worth of loans. The jury had some sort of question about that. So the judge came back with a supplemental jury instruction. Counsel points out that there was some discussion and some question at first about using the will support. But there's an extensive colloquy that goes beyond that, where we added the language, you know, if you prove everything else beyond a reasonable doubt. And I think that relieved any of his concerns. And I think if you look at this, the original instruction was re-read. This was re-read. And after it said every one of the elements of 9, 10, and 11 are met beyond a reasonable doubt. So there's not really, I think, any real concern that the jury would have been confused or felt that they had to automatically convict on the aggravated identity theft if they convicted on one of the underlying accounts. Again, it was an accurate statement of the law. Nothing about it was inaccurate. The jury had a question and the judge answered it. The remaining issues addressed, the Allen charge, there was no error given there. There's no abuse of discretion. It happened less than two days after the deliberation. There was sufficient evidence to support the conviction. Again, there was plenty of testimony by the bank official. And one correction, Mr. Davis was not the only former bank employee to testify. Mr. Tate, who was the former bank president and the one that actually committed the fraud, testified on behalf of the government as well, as did Mr. Tevis' foreman, who used his five-year-old son's social security number to get the loan, as well as agents for the FBI, FDIC. And then all the documents, all the testimony, including the testimony of Mr. Davis, was fully supported by the documents of record. Everything Mr. Davis said and everyone else was supported by documentary proof. With regard to that, I believe that answers all that addresses the issues. If there are no other questions from the court, we would request that the conviction of Lee Tevis be affirmed. Your Honors, to briefly address Mr. Sparks' point that the settlement agreement doesn't address Mr. Tevis and the two amigos' loans, that's just not the case. If you look at the settlement agreement, it very clearly includes those parties. But I don't want to spend my time going back on the settlement agreement. Last point about the settlement agreement. I think this circuit is in a unique position to make some law here. I don't believe the McAuliffe case is on point in this case. And the Manco case that I cited out of the Second Circuit very clearly says that a civil settlement agreement may be utilized in a criminal proceeding. And I think this is an opportunity, and I hope the court follows Manco's thinking. With respect to my second argument, the problem with convicting Mr. Tevis on counts 2 through 11 is that convictions on the financial crimes are predicated on the notion that Mr. Tevis, and proof, that Mr. Tevis intended to influence the bank to do something, or that he actually influenced the bank to do something. In this case, that's an impossibility, because the facts, undisputed facts, are that Mr. Tate, the bank president, comes to Mr. Tevis and says, we're going to make these loans. Here's what I want you to do. As bank president with the authority to make the loans happen, the decision was already made before Mr. Tevis... Isn't that just simply not true? Because the whole reason he gets in this fix is he can't authorize the additional monies above whatever it was, a million dollars. And that's why now we have two amigos and a five-year-old putting their social security number. That brings up an interesting point, Your Honor, because the loans were ultimately approved by Mr. Tate's boss, Timothy Wesley, CEO, who had a $2 million lending authority. And the testimony indicates that the loans were approved by him. I mean, my point is Tate couldn't approve them, and therefore Tate saying, we're going to get these done, doesn't mean Mr. Tevis, therefore, was immaterial to them getting done. Well, by the same token, Mr. Tevis never made any representation to Mr. Wesley about anything. The fact that Mr. Tate might have had intent says nothing about whether Mr. Tevis could also have had the intent. Sure, but I asked the jury would have found that Mr. Tevis had the requisite intent. Where is the proof that Mr. Tevis ever made any false statement to any person about anything? What do you think the social security number of a five-year-old is? Mr. Tevis neither supplied it nor filled out any document. He was there procuring. He was an aider and a better if he wasn't the person who actually filled out the form. Well, it depends on whose testimony you believe, Your Honor. Well, that's what the jury did. The jury decided who's to believe. I'm just saying there's evidence in the record that Mr. Tevis went no farther than setting up LLC at the Secretary of State's office per Mr. Tate's instructions, bringing Mr. Martinez to his office and that Mr. Tate then said, do you have a son who has a social security number? That's not Mr. Tevis' testimony. Of course, Mr. Tevis is providing his own social security number for two amigos. Even though that was not directed at the bank, it is evidence of an intent to defraud in the overall scheme of transactions. I brought it up myself because I believed that it wasn't evidence of that. I believe that it was evidence, the theory being he's trying to conceal his association with two amigos and the theory being he understood a plan where we need to get a guy with a social security number. If he understood the plan, why would he choose someone who didn't have a social security number? Why would he associate himself on legal documents with the entity? That was my interpretation of that fact. Providing his social security number in that context was evidence of honesty, not evidence of deception? I believe so. We got it. Anything further? Thank you very much for your time. We appreciate the argument both of you've given and we'll consider the case carefully. Mr. Kirtley, we note that you were taking the representation and your advocacy on behalf of Mr. Tevis. Thank you. It was an honor to be on the case. You did a fine job. Thank you.